## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ABRAHAM ATACHBARIAN<br><br>                    Plaintiff,<br><br>        v.<br><br>ADVAXIS, INC.; DAVID SIDRANSKY; JAMES P. PATTON; RICHARD J. BERMAN; RONI A. APPEL; KENNETH A. BERLIN, AND; SAMIR N. KHLEIF,<br><br>                    Defendants. | Case No.:<br><br>**COMPLAINT FOR VIOLATIONS OF SECTIONS 14(A) AND 20(A) OF THE SECURITIES AND EXCHANGE ACT OF 1934**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Abraham Atachbarian ("Plaintiff") by and through his undersigned counsel, alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation, review and analysis of public filings made by Advaxis, Inc. ("Advaxis" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"), and review and analysis of the press releases and other publicly available information regarding the impending merger of Advaxis with Biosight, Ltd. ("Biosight") (the "Transaction"), in which Advaxis is effectively selling control of itself to Biosight.

## NATURE OF THE ACTION

1.      Plaintiff brings this action to cure violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Section 20(a) of the Exchange Act, in connection with the proposed merger of Advaxis and Biosight and the Definitive Proxy Statement on Schedule 14A, that Advaxis filed on

October 21, 2021 (the "Proxy Statement") pursuant to which it intends to solicit shareholder approval of the Transaction, among other things, as further discussed below

2.     On July 6, 2021, Advaxis announced via press release that it had entered into a definitive merger agreement with Biosight. The release stated that "the shareholders of Biosight will become the majority holders of the combined company immediately following completion of the transaction", such that the Transaction is a change of control transaction in which Advaxis is effectively selling almost all of itself to the privately held Biosight.

3.     The release clarifies that under the terms of the Merger Agreement, "Advaxis will acquire all of the outstanding share capital of Biosight in exchange for the issuance of newly issued shares of Advaxis common stock upon closing, subject to the satisfaction or waiver of customary closing conditions, including the receipt of the required approval of the Advaxis stockholders and Biosight stockholders and certain regulatory approvals. Upon completion of the merger, Advaxis's then-current equity holders will own approximately 25% and the former Biosight equity holders will own approximately 75% percent of Advaxis's common stock, calculated on a fully diluted basis."

4.     Under the terms of the Transaction, as set forth in the Merger Agreement executed on or about July 4, 2021 (the "Merger Agreement") Biosight, a foreign private company related to Defendant David Sidransky, the Chairman of Advaxis' board ("Board", "Board of Directors"), will receive 118.2009 shares of Advaxis for each share of Biosight,  After the Transaction, Advaxis then intends to effect a reverse stock split, such that Advaxis shareholders will be left with a stub equity interest in the resulting company that is virtually worthless while Biosight and its shareholders will have control over and will have purchased Advaxis' valuable assets for inadequate consideration.

5.      The Proxy Statement set the date of the special meeting of shareholders to vote on the proposed merger as November 16, 2021.

6.      The Proxy Statement, as detailed below, fails to disclose material information necessary for Advaxis shareholders to properly assess the fairness of the Transaction, thereby rendering statements in the Proxy Statement materially incomplete and misleading. In particular, the Fairness Opinion, rendered by a conflicted investment advisor, LifeSci Capital ("LifeSci"), essentially has no analysis much less one leading to the conclusion that the Transaction and the exchange ratio ("Exchange Ratio") of one Biosight share to 118.2009 shares of Advaxis, is fair, and was crafted to mislead Advaxis shareholdes into approving an unfair and inadequate Transaction.

7.       It is imperative that the material information that has been omitted from the Proxy Statement be disclosed to Advaxis shareholders and/or that the analysis in the Fairness Opinion, among other things, be included in any revised Proxy, including an analysis of the value of Biosight, prior to the forthcoming shareholder vote so that they can properly exercise their corporate suffrage rights.  For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and Rule 14a-9 thereunder and Section 20(a) of the Exchange Act.

8.      Plaintiff seeks to enjoin Defendants from holding a shareholder vote on the Transaction and taking any steps to consummate the Transaction unless and until the material information discussed below is disclosed to Advaxis shareholders sufficiently in advance of the vote on the proposed merger or, in the event the proposed merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act including damages in relation to the unfair price and inadequate consideration being offered to Advaxis' shareholders.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331 as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.  This is not a collusive action to confer jurisdiction on a court of the United States, that it would not otherwise have.

10.     Personal jurisdiction exists over each Defendant because Defendants are either a corporation headquartered in the state of New Jersey or are individuals who serve on the Board of Advaxis and therefore are present in this state for jurisdictional purposes or have sufficient minimum contacts with this State and District so as to render the exercise of personal jurisdiction over them by this Court as permissible under traditional notions of fair play and justice.

11.     In connection with the wrongs alleged herein, Defendants used the mails and the means or instrumentalities of interstate commerce.

12.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391, because Defendant Advaxis is headquartered in this District and each of the Defendants have extensive contacts and do business in this State and judicial district.

## PARTIES

13.     Plaintiff is, and at all relevant times has been, an Advaxis shareholder.

14.     Defendant Advaxis is a Delaware corporation with its principal place of business in Princeton, New Jersey. Advaxis is a clinical-stage biotechnology company focused on the advancement of cancer treatment technology.

15.     Defendant David Sidransky ("Dr. Sidransky") is, and at all times relevant to this action has been, the Chairman of Advaxis, Inc. Dr. Sidransky is also a co-founder and general partner of the Israel Biotech Fund, a major investor in Biosight, making Dr. Sidranksy a major

investor in the privately held Israeli company, Biosight, a co-founder of Champions Biotechnology, Inc., and Chairman of Tamir Biotechnology, Inc. Per the Proxy Statement, Israel Biotech Fund I, L.P. and Israel Biotech Fund II, L.P. collectively own 12.8% of Biosight, and would own 8.5% of the proposed combined company. Dr. Sidransky would serve as a director of the proposed combined company and would also receive compensation as a non-employee director of Advaxis.  Dr. Sidransky is an owner of shares of share capital (or options to purchase capital stock) of Biosight. Israeli Biotech Fund I, L.P. and Israeli Biotech Fund II, L.P. collectively own an aggregate of 371,608 of Biosight's preferred C shares and warrants to purchase up to 48,774 of Biosight's preferred C shares, which represent, in the aggregate, ownership of approximately 10% of Biosight calculated on a fully diluted basis.

16.     Defendant James P. Patton is, and at all times relevant to this action has been, Vice Chairman of Advaxis.

17.     Defendant Richard J. Berman is, and at all times relevant to this action has been, a member of the Board.

18.     Defendant Roni A. Appel is, and at all times relevant to this action has been, a member of the Board.

19.     Defendant Kenneth A. Berlin ("Mr. Berlin") is, and at all times relevant to this action has been, President and CEO of Advaxis. Mr. Berlin is contractually entitled to a severance payment of 1.75 times his base salary upon execution of the proposed merger, Mr. Berlin is also entitled to a bonus payment, continued health and welfare benefits for 21 months, and stock options and stock awards. Mr. Berlin would also serve as a director and CEO of the proposed combined company. The vesting of approximately 73,777 Advaxis options granted Mr. Berlin will accelerate

in connection with the closing of the merger. Mr. Berlin is entitled to full accelerated vesting of all outstanding equity awards upon a change in control, as defined in his employment agreement.

20.     Defendant Samir N. Khleif ("Dr. Khleif") is, and at all times relevant to this action has been, a member of the Board. Dr. Khleif would serve as a director of the proposed combined company and would also receive compensation as a non-employee director of Advaxis.

21.     The Defendants named in ¶¶15-20 above are collectively referred to herein as the "Individual Defendants" and, with Advaxis as "Defendants".

<u>**SUBSTANTIVE ALLEGATIONS**</u>

A.     <u>**Background of the Transaction**</u>

22.     The Background of the Merger section of the Proxy indicates that the entire process leading to the Transaction was tainted by Sidransky's self-interest and was skewed to ensure that a transaction was consummated with a Sidransky related entity, even where other bidders existed.

23.     Advaxis claims that, beginning in February of 2019, it retained a Financial Advisor, identified in the Proxy only as Financial Advisor A, to review strategic alternatives.

24.     Accordingly, the Proxy indicates that this Financial Advisor A corresponded with more than 200 potential transaction counterparties on a broad variety of transaction types, including potential M&A, in-licensing and out-licensing transactions. Advaxis further claims that various strategic alternatives were discussed, over 20 nondisclosure agreements were entered into, and certain due diligence information was exchanged with certain of the potential counterparties.

25.     Advaxis notes that many of the potential counterparties were responsive to overtures made on its behalf.

26.     Nonetheless, and despite the fact that the Financial Advisor created interest in the purchase or merger with Advaxis on behalf of several entities, including one identified as Party A, in February 2020, the Advaxis board, including presumably Dr. Sidransky and other now-

interested directors, determined that such proposals would not enhance shareholder value, and terminated Financial Advisor A's engagement.

27.     Although it was in discussions with a number of counterparties at the time, in May 2020, the Advaxis Board, again including Dr. Sidransky, decided to retain LifeSci as its new financial advisor, despite the fact that it was then under contract as a consultant to the Sidransky-related entity, Biosight.  Notably, at the time LifeSci was retained, at least according to the Proxy, there was no discussion of its conflicts of interest.

28.     Less than a month after retaining LifeSci, Dr. Sidranky made his first bid to have a related entity, identified as Party C, enter into a transaction with Advaxis for a 40/60 split of the resulting company, but eventually declined to consummate a transaction.

29.     Party A continued to express interest in a transaction with Advaxis and sweetened its previous offer. Advaxis authorized the Board to negotiate a letter of intent with Party A, while at the same time, allowing LifeSci to continue its ongoing activities of exploring options for the Company.

30.     With a potential transaction with Party A looming, Dr. Sidransky introduced Biosight into the mix, and the parties entered into non-disclosure agreements.

31.     Thereafter, Party A offered a superior transaction, providing Advaxis with a deal with an 80/20 split of the resulting company, and a PIPE investment of $80-$100M.

32.     Immediately thereafter, Advaxis executed a non-disclosure agreement with Biosight, and a draft proposal that required that Advaxis terminate discussions with Party A. Notably, the Biosight proposal only valued Biosight at $120M (far less than the $218M value eventually used by LifeSci in its Fairness Opinion), and only valued Advaxis at $35M, far less

than even its trading price, and offered a 77.5 to 22.5 split, and then only if Advaxis had $15M in net cash at closing.

33.     While the Board presumably negotiated with both Party A and Biosight, Biosight sent an updated letter decreasing its offer to only a 20/80 split of the resulting company, and the Board subsequently determined to enter into a letter of intent with Biosight for a potential transaction with Advaxis shareholders owning only 20% of the resulting company.

34.     Although there is no indication of any hostile bid or even any letter sent by any potential hostile actor, at this time the Advaxis Board, presumably including Dr. Sidransky, determined to adopt a poison pill, dampening any additional interest for the Company and helping to secure a deal with Biosight.

35.     Biosight, after being unable to go forward with a public offering, made a revised bid for Advaxis, in which Biosight would now have 90% of the resulting company, but which would be revised downward depending upon the amount of money that Advaxis held at closing.

36.     The Advaxis Board subsequently determined to proceed with a letter of intent with Biosight. At this Board meeting. Dr. Sidransky finally absented himself for a portion of the meeting.

37.     However, another director, Appel, also abstained from voting to proceed with a transaction for Biosight and apparently did not vote to proceed with this self-interested deal with Biosight.

38.     The adoption of the poison pill was subsequently confirmed by the Board, as was the Amended and Restated By-laws of Advaxis.

39.      Discussions with Biosight continued toward a final merger agreement. In the meantime, Advaxis held a public offering in November 2020, in which it closed on $9.2million in

investments, and continued discussions with an entity identified as Party D, for licensing certain of its products in its "HOT" program.

40.     Thereafter, in January 2021, Advaxis received additional milestone payments related to the licensing of another product.

41.     The negotiations and Board discussions concerning the terms of a transaction with Biosight continued through early January 2021, with Biosight indicating a transaction for which Advaxis shareholders would only receive 17.5% of a resulting company that Biosight placed at $400M (providing Biosight with a valuation far higher than even that provided by LifeSci).

42.     Although the Advaxis Board rejected this proposal, and was contacted by two other counterparties, which it rejected, it eventually renewed negotiations with Biosight, at a 75/25 split, although the Proxy omits the value then placed on Biosight or the resulting company.

43.     Significantly, about this time, Advaxis announced a definitive agreement with two institutional investors for the sale of common stock at $.7921 per share, far higher than the price being assigned to its common shares by LifeSci in the Fairness Opinion.

44.     A licensing agreement for one of Advaxis' HOT products, with Party D, which could have brought more money into Advaxis, was deferred until after the potential Transaction.

45.     Earlier, on April 8, 2020, Advaxis received a letter from Nasdaq indicating that Advaxis no longer met its requirement to maintain a minimum bid price of $1 per share and that, according to its Listing Rules, Advaxis would have a period of 180 days in which to regain compliance. However, at a virtual stockholder meeting on June 17, 2021, Advaxis shareholders voted against a reverse stock split that was necessary to ensure compliance with the Nasdaq listing requirement.

46.     In about June 2021, Party A contacted Advaxis with renewed interest in a transaction, but after sending information, Advaxis had no further contact with Party A, much less any contact to commence a bidding war and obtain a higher price for the Company.

47.     Revised merger agreements with Biosight continued to be exchanged, and support agreements were almost finalized despite the Board not having a fairness opinion or any indication that the contemplated transaction was fair.

48.     At a Board meeting on July 2, 2021, LifeSci rendered its presumed Fairness Opinion, and its conflicts were finally disclosed to the Board.  Nonetheless, the re-constituted Board, without Dr. Sidransky, voted to approve the Transaction, and the Merger Agreement was finalized on July 4, 2021, despite LifeSci's conflicts and lack of analysis.

49.     The Transaction as announced on July 6, 2021.

50.     The Proxy was filed on October 21, 2021, and the virtual shareholder meeting is to be held on November 16, 2021.

51.     At that meeting, Advaxis shareholders will be asked to approve the following:

(1) the Transaction by way of the issuance of shares to Biosight; (2) the amendment of Advaxis' certificate of incorporation to allow for a post-merger reverse stock split (similar to that already rejected by Advaxis shareholders); (3) approval of an amendment to change the name of the Company to "Biosight Therapeutics Inc."; (4) approval of a non-binding advisory proposal regarding compensation; and (5) a vote to adjourn the meeting to enable Advaxis to solicit additional shareholder votes if the Transaction does not pass.

**B.** **Material Omissions and Material Misstatements in the Proxy Statement**

52.     The Proxy fails to provide material information or is misleading with respect to the: (1) Background of the Merger; (2) the Fairness Opinion and the resulting conclusion that the Transaction is fair from a financial point of view to Advaxis shareholders; and (3) essential projections.

### The Background of the Merger

53.     The Background of the Merger section of the Proxy is materially misleading and omits material information. In fact, the Background is drafted to mislead shareholders into believing that the Transaction was the product of an untainted and fair process resulting in a fair price when in fact, the entire process was skewed to ensure that a Sidransky-related entity would ultimately obtain a sweetheart deal.

54.     The Transaction is a related party, self-interested transaction in which Dr. Sidransky has a direct financial interest as a co-founder and shareholder of the Israeli Biotech Fund that owns a substantial part of Biosight and the Chairman of Advaxis. At least two other directors, including Mr. Berlin, Advaxis' Chief Executive Officer, and Dr. Khalif, an outside director, have direct pecuniary interests in the Transaction.

55.      It is therefore a related party transaction, in which Advaxis and its shareholders should have been protected by the creation of a committee of independent directors, who retained a separate, independent financial advisor and separate, independent counsel to negotiate with Biosight and Dr. Sidranksy on their behalf.

56.     Such an independent committee, counsel and financial advisor were particularly important since LifeSci is presently under contract with Biosight and receives approximately $10,000 per month from it, such that it is beset by disabling conflicts of interest.

57.     The Background misleadingly indicates that at certain points, Dr. Sidransky left particular board meetings at which a potential proposed merger with Biosight was discussed, which gives the Advaxis shareholders the false and misleading impression that their interests were properly protected, when in fact they were not.

58.     The Background is further misleading in its discussion of Advaxis' review of strategic alternatives.

59.     It states that Advaxis retained a financial advisor, named only as Financial Advisor A in the Background of the Merger, and that this unnamed financial advisor initiated a formal strategic process, and states that this resulted in over 20 nondisclosure agreements being signed, but fails to disclose the types of transactions then being discussed, and the results of these agreements.

60.     It further omits material information about a potential transaction with an entity, named only as Party A, what the terms of that transaction were, the amount of consideration that would have been received by Advaxis shareholders as a result of that transaction, and why the transaction with that entity was suddenly terminated or why the Board determined to do a public offering and with whom instead of a transaction with Party A.  It also fails to state why discussions with Party A, which were renewed later in the process, did not proceed and whether Party A was discouraged from proceeding with a superior bid given Advaxis' tilt towards a Sidransky-related deal.

61.     It also fails to disclose or is misleading as to why Financial Advisor A was terminated in February 2020, after bringing numerous opportunities to the Company, and LifeSci, a conflicted alleged financial advisor, was engaged when it was already under contract and receiving monthly payments from Biosight.

62.     The Background further omits the reasons or is misleading concerning why the Company, although in the middle of negotiating a deal with Party A which would have resulted in an 80/20 transaction, and the investment of $80-$100M investment in Advaxis, terminated that letter of intent with Party A, in favor of a potential transaction with Biosight, which also offered only a 90/10 split at the time, and potentially an inadequate valuation of Advaxis.  In fact, it was to ensure that a deal with a Sidransky-related entity was ultimately approved.

63.     Finally, the Background is materially false and misleading in its discussion as to why, in the midst of negotiations, the Advaxis board suddenly decided to adopt a poison pill.

64.     The Background falsely states that it was to ensure that the Company was not subject to any hostile takeover, although there is no disclosure of any hostile overtures by any company.

65.     Contrary to statements in the Background, the Background fails to state that the poison pill was put in place to ensure consummation of a deal with Biosight and to discourage other potential bidders, when there was no indication of any hostile interest (proxy, p. 78). The poison pill does not apply to anyone who acquires the company and therefore will not apply to Biosight.

66.     Moreover, the Background falsely states that the poison pill was put in place to allow management to determine its long terms goals (Proxy at 78) when it had already determined to sell all or at significant portion of the Company.

**The Fairness Opinion Is Materially Misleading and Omits Material Information**

67.     A fairness opinion is one of the most critical parts of a proxy statement and is relied upon by shareholders in determining whether to vote for an extraordinary transaction.

68.     The fairness opinion ("Fairness Opinion") contained in the Proxy Statement is materially misleading and omits critical analysis and inputs and metrics, and in fact fails to perform virtually any analysis at all. Moreover, its conclusion makes little sense and is misleading.

69.     Although investment advisors do not have to disclose every metric upon which their analysis is based, the LifeSci Fairness Opinion fails to disclose virtually any input on which it is based.

70.     The Fairness Opinion issued by the conflicted LifeSci is materially misleading and omits material information without which Advaxis shareholders cannot make an informed decision about the fairness of the proposed merger.

71.     LifeSci first performed an "Advaxis Selected Comparable Company Analysis" to determine a range of values for Advaxis. It chose seven purportedly comparable companies, but chose those companies only by their equity capitalization rates and not by any other metric. Therefore, its choice of purportedly comparable companies is misleading.

72.      Moreover, in looking at these companies, LifeSci only calculated the mean and median of the equity market values of these companies, and then used those figures to announce that the implied equity value of Advaxis is $62 million (mean) or $66 million (median), when in fact Advanix had a fully diluted equity value far above either of those valuations, at $72 million.

73.     There are no further disclosures as to how LifeSci justified applying a lower range. Nor did LifeSci, purportedly an independent advisor, obtain and use any projections to make an informed decision as to the actual value of Advaxis, including when it would likely earn revenues and what those revenues would be, among other things, based upon management's

projections.  In fact, LifeSci obtained almost no projections other than about a year's worth of cash spending.

74.     LifeSci then states that it "compared this range to the exchange ratio" but fails to disclose that analysis.  In fact, the Proxy Statement states that the exchange ratio was calculated through negotiations between Advaxis and Biosight, and thus that the entire Fairness Opinion and LifeSci's conclusion about the fairness of the exchange ratio was backed into based upon the exchange ratio (75:25% of the resulting company), and that no analysis was done of the actual implied value of Biosight—much less sufficient information to opine that the exchange ratio is fair.

75.     Therefore, the Fairness Opinion fails to contain any analysis of the fairness of the exchange ratio and is merely manipulated to support the conclusions that Advaxis is worth about $72M (its equity market value) and thus that Biosight must have an implied equity value of three times that amount (based on the exchange ratio) of $218M.

76.     No analysis of Biosight's actual value was ever performed, and thus is omitted from the Fairness Opinion.

77.     LifeSci then performed the "Advaxis Market Valuation Analysis" where it reviewed trading prices for Advaxis shares for the prior 30, 60 and 90 day period to determine whether, based upon a $.49 per share price, the exchange ratio is fair.

78.     Although under the volume-weighted average price ("VWAP") of Advaxis' share prices, the $.49 per share price is low and out of the range, in order to justify the $.49 per share price, LifeSci intentionally added an analysis of the stock price based upon the 25th and 75th percentiles.

79.     The 25th percentile was the only way it could justify the use of the $.49 price per share, and LifeSci fails to indicate how it can consider stock prices that occur infrequently (25% or less). By contrast, the VWAP is the appropriate standard for such analyses.

80.     By giving the same weight to the VWAP, the 25% and 75% percentiles, LifeSci inaccurately skews the range of appropriate prices lower to justify the use of the $.49 per share price for Advaxis shares.

81.     It then concludes, without any analysis, that the exchange ratio is fair, again without disclosure of the number of Biosight shares used, or the price per share of Biosight, or even the price of Advaxis which it is using.

82.     Notably, based upon a VWAP, the $.49 per share is not fair, and an exchange ratio based upon that price could not be fair.

83.     The Fairness Opinion then purportedly analyzes the value of Biosight. It first sets forth a "Biosight Selected Comparable Initial Public Offering Analysis". It omits or fails to indicate whether any of the selected "comparable" companies have a market for their productions under development, their size or the competition for their production, nor does it specify whether any of these purportedly comparable companies have any revenues. The critical failure to determine whether the selected "comparable" companies are situated in circumstances similar to those of Biosight's position renders this analysis hopelessly insufficient and further skews the conclusion of the Fairness Opinion.

84.     In fact, NGM, one of the selected "comparable" companies, has revenues of $103.5M, and thus is not comparable to Biosight, which has no revenue.

85.     Again, as with its analysis of Advaxis, LifeSci cherry-picks early stage pharmaceutical companies and lists their pre-money fully diluted equity value, taking the mean and median.

86.     LifeSci then states that, based upon these mean and median amounts, it calculated a range of implied equity values for Biosight of between $187M to $406M. However, it did not calculate anything, but merely just stated that the value of Biosight must be in the range of either the mean ($187M) or median ($406M), and that Biosight's implied equity value, based upon the exchange ratio of 118.2009, compared with those "ranges."

87.     Again, the LifeSci analysis provides no basis for how it derived the implied equity calculation for Biosight, which companies it gave more weight to, why it chose these particular companies, how they relate to Biosight, its business, and the fact that it faces regulatory headwinds in Israel, and the variable risks faced by each company, and fails to derive any "range" of potential implied values.

88.     Moreover, it again fails to disclose how it calculated Biosight's implied equity value, and its $218M valuation conflicts with values obtained using the information in the pro forma statements included in the Proxy Statement, including the number of shares of Biosight that are outstanding.

89.      According to the pro forma statements in the Proxy Statement, on June 30, 2021, Biosight had a weighted average number of common shares outstanding, basic and diluted, of 877,979.[1] If the holder of each of those Biosight shares receives 118.2009 shares of Advaxis at $.49 per share, the implied equity value of Biosight is nowhere near the $218 million valuation being used. Therefore, the exchange ratio, in which Biosight receives approximately 75% of

---

[1] Proxy Statement at 212.

Advaxis, compared to what it contributes to the resulting proposed combined company, is not fair.

90.     In short, any analysis of how LifeSci derived the $218 million valuation for Biosight, much less the fairness of the exchange ratio, is material information that is completely missing from the Fairness Opinion, making it misleading and inadequate.

91.     LifeSci's analysis entitled "Selected Comparable Phase 2 Oncology Initial Public Offerings" suffers from the same material omissions and misleading analysis.  Moreover, LifeSci's choice of comparable companies has little basis other than the focus on oncology, which is far too broad a category.  It also does no analysis, nor does it choose companies with comparable revenues, size, or market potential.

92.     For instance, in this analysis, it uses BioNTech SE, the maker of one of the primary Covid-19 vaccines being used worldwide, as one of the comparable companies, although it clearly is not a comparable company to Biosight, which does not have a worldwide drug in production.

93.     Nonetheless, by including BioNTech SE as a comparable company, LifeSci skews the range of equity values for such companies extremely high and thus sets Biosight at an artificially high range of $648M (median) and $819M (mean).  It then compares this with the purported $218M implied equity value for Biosight, making the price effectively being paid for Biosight by Advaxis misleadingly seem cheap by comparison.

94.      This skewed and unfair comparison is used to justify LifeSci's conclusion that the exchange ratio must be fair, but again omits any projections or analysis of the actual value of Biosight, or any net present value of the company, much less any analysis of the exchange ratio.

95.     Finally, LifeSci performs a "Biosight Selected Comparable Company Analysis" that, similar to the purported analysis done for Advaxis, involves only listing the fully diluted equity market values of a limited number of cherry-picked early stage pharmaceutical companies, finding the median ($381M), and mean ($766M), and then stating, without any analysis, that these must be the "implied equity range" for Biosight and compares those manipulated and useless values to Biosight's purported implied equity value of $218M.

96.     Again, this is a manipulated and misleading presentation. Although LifeSci purportedly chose these comparable companies based upon their financial and operational metrics, it fails to disclose what those metrics were or which companies (and thus what market values) are most relevant to Biosight, much less performs any type of analysis of the market values weighted toward those that are most like Biosight.

97.     Instead, it merely states that the mean and median values must be the values assignable to Biosight in order to justify its purported implied equity value of $218M, and the purported fairness of the exchange ratio,  again omitting any analysis supporting that conclusion.

98.     LifeSci could just as easily have concluded that companies at the low range of the group were more comparable to Biosight. There is nothing that provides shareholders with sufficient information to determine where Biosight falls within the range of comparable companies, if in fact, these companies are comparable.

99.     In short, the entire Fairness Opinion, performed by a conflicted financial advisor, who was under contract to Biosight at the time the opinion was rendered, is materially misleading, and was manipulated and designed to falsely convince Advaxis shareholders that: (1) the exchange ratio is fair; (2) that the value of Advaxis is less than its actual market value of

about $73M; and (3) that the implied market value of Biosight, a foreign private company for which shareholders have no access to financials, is $218M.

### **The Absence of Projections**

100.    Although it seems impossible that management for Advaxis and Biosight do not have projections of potential revenue, risks, and the time periods when they believe that their products may come to market, the Proxy Statement is devoid of any of those projections other than a simplistic cash burn projection for the next several quarters.

101.    LifeSci apparently was not provided with any projections, one reason among many of why the Fairness Opinion has no basis in fact.

102.    Moreover, the Proxy Statement fails to disclose or omits any standalone analysis and projections of Advaxis. In a recent press release related to the proposed merger dated November 11, 2021, Biosight stated that the proposed merger is "a superior outcome compared to both a standalone Advaxis and standalone Biosight."[2]

103.    This indicates that management of Advaxis must have reviewed an analysis of Advaxis as a standalone entity, and that this was part of the consideration when the Advaxis Board approved the proposed merger.  However, the Proxy Statement omits any standalone analysis or projections, and any projections or analysis of other strategic alternatives. The Proxy Statement is misleading for this additional reason.

---

[2] https://www.yahoo.com/entertainment/biosight-encourages-advaxis-stockholders-vote-130000993.html?soc_src=social-sh&soc_trk=ma.

## COUNT I

### AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT AND RULE 14A-9 PROMULGATED THEREUNDER

104.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

105.     Section 14(a)(1) makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. §78n(a)(1).

106.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) provides that communications with shareholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

107.     Defendants have issued the Proxy Statement with the intention of soliciting shareholders' support for the proposed merger.  Each Defendant reviewed and authorized the dissemination of the Proxy Statement, which omits critical information regarding, among other things, the background of the proposed merger and financial projections for Advaxis.

108.     In so doing, Defendants omitted material facts necessary to make the statements made not misleading.  Each Defendant, by virtue of their roles as officers and/or directors, was aware of the omitted information but failed to disclose such information, in violation of Section

14(a).  Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

109.    Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the proposed merger.

110.    Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the Proxy Statement materially incomplete and misleading. Indeed, Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

111.    Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement.  The preparation of a proxy statement by corporate insiders omitting a material fact constitutes negligence.  Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as Advaxis directors.

112.    The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, who will be deprived of her right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the proposed merger.

113.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

## AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT

114.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

115.     The Individual Defendants were privy to non-public information concerning the Company and its business and operations through access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the Proxy Statement was materially misleading to Plaintiff in his capacity as a Company stockholder.

116.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially misleading statements were being issued by the Company in the Proxy Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.   The Individual Defendants were able to, and did, control the contents of the Proxy Statement. The Individual Defendants were provided with copies of, reviewed and approved and/or signed the Proxy Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

117.     The Individual Defendants were also able to, and did, directly or indirectly, control the conduct of Advaxis, the information contained in its SEC filing, and its public statements. Because of their positions and access to material non-public information, the Individual Defendants knew or should have known that the misrepresentations and omissions specified herein had not been properly disclosed and were being concealed from Plaintiff and the Company, and that the Proxy Statement was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the Proxy Statement and are therefore responsible and liable for the misrepresentations and omissions of material fact contained therein.

118.     The Individual Defendants acted as controlling persons of Advaxis within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause Advaxis to engage in the wrongful conduct complained of herein.   The Individual Defendants controlled Advaxis and all its employees.  As alleged above, Advaxis is a primary violator of Section 14(a) of the Exchange Act. By reason of their conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Enjoining Defendants and all persons acting in concert with them from proceeding with any shareholder vote on the Transaction or consummating the Transaction, unless and until Advaxis discloses the material information discussed above which has been omitted from the Proxy Statement or corrects its material misstatements;

(b)     Enjoining and revoking the poison pill;

(c)    In the event the Transaction closes, directing Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

(d)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

(e)    Granting such other and further relief as this Court may deem just and proper.

Dated: November 15, 2021

Respectfully submitted by:

Howard T. Longman (NJ Bar# 264 88 2018)
LONGMAN LAW, P.C.
354 Eisenhower Parkway, Suite 1800
Livingston, NJ 07039
Tel: (973) 994-2315
Fax: (973) 994-2319
Email: Hlongman@longman.law

Lynda J. Grant
THEGRANTLAWFIM, PLLC
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tel: (212) 292-4441
Fax: (212-292-4442
Email:  Lgrant@grantfirm.com

**Counsel for Plaintiff**